## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 16–cr–0072 (KBJ) |
| | ) | |
| ANTOINE MILLER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OPINION

Defendant Antoine Miller has been charged with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). (*See* Indictment, ECF No. 1 at 1.)[1] Before this Court at present is Miller's motion to suppress the gun and the ammunition that were recovered during his arrest.  (*See* Def.'s Mot. to Suppress Physical Evid. ("Def.'s Mot."), ECF No. 7.)  Miller contends that he was unlawfully seized in violation of the Fourth Amendment when officers in the Metropolitan Police Department ("MPD") Gun Recovery Unit approached him in an unmarked vehicle while he was walking down the sidewalk and repeatedly asked him whether or not he was carrying a gun.  (*Id.* at 4.)

On October 12, 2016, this Court held an evidentiary hearing regarding Miller's motion to suppress, during which Officers Matthew Hiller and John Wright of the MPD

---

[1] Page-number citations to the documents the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.  However, page-number citations to the October 12, 2016 evidentiary hearing transcript refer to the page numbers within that transcript, which was not filed in the Court's electronic filing system.

testified to the events surrounding Miller's arrest.  Miller also testified at the evidentiary hearing; he provided an account of the events leading up to his arrest that directly contradicted the testimony of Officers Hiller and Wright.  As explained fully below, this Court credits the testimony of Officers Hiller and Wright, and as a result, concludes that Miller was not seized for the purpose of the Fourth Amendment when the officers approached him and asked whether he was carrying a gun.  Moreover, under binding precedents from the D.C. Circuit, it is clear that a Fourth Amendment seizure occurred only when Officer Hiller physically restrained and arrested Miller following Miller's admission that he had a gun, and at *that* point, Officer Hiller plainly had probable cause to justify Miller's arrest.  Accordingly, Miller's motion to suppress the gun and ammunition is **DENIED**.

## I.      BACKGROUND

On April 26, 2016, a grand jury in the U.S. District Court for the District of Columbia indicted Defendant Antoine Miller of one count of being a felon-in-possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  (*See generally* Indictment.)  According to the indictment, Miller had "unlawfully and knowingly" possessed a .40 caliber semiautomatic Smith & Wesson pistol and .40 caliber ammunition on or about March 31, 2016.  (*Id.* at 1.)  During the evidentiary hearing that this Court held regarding Miller's motion to suppress, the law enforcement officers who were involved in Miller's arrest testified about the circumstances leading up to their discovery of the weapon, and Miller also testified to facts that contradicted the officers' testimony in several respects.  The different versions of the events preceding Miller's arrest are as follows.

**A.     Arrest-Related Facts Attested To By Officers Hiller And Wright**

At approximately 9:53 PM on March 31, 2016, Officer Matthew Hiller, Officer John Wright, and Detective Kirk Delpo of the MPD Narcotics and Special Investigation Division Gun Recovery Unit were patrolling the Seventh District in the District of Columbia.  (*See* Oct. 12, 2016 Suppression Hr'g Tr. ("Hr'g Tr."), at 13:4–23, 14:13–22; Gov't Opp'n to Def.'s Mot. to Suppress ("Gov't Opp'n"), ECF No. 8, at 1.)  The Gun Recovery Unit, which is tasked with recovering illegal firearms in Washington, D.C., had been dispatched to the Seventh District due to recent spikes in violent crime and gun activity in that area.  (*See* Hr'g Tr. at 12:20–21, 14:16–18.)  The three officers rode in an unmarked gray Ford Explorer, and Officer Wright—to whom the vehicle had been assigned—was driving.  (*See id.* at 14:1–8, 111:16–17, 117:8–11.)  Officer Hiller was located in the front passenger seat, and Detective Delpo was situated in the back seat. (*See id.* at 14:7–12, 112:5–11.)  All three officers wore tactical vests bearing the word "Police" in white block lettering on the front and back.  (*See id.* at 14:2–4, 16:10–14.) Officers Hiller and Wright wore casual attire underneath their tactical vests, while Detective Delpo wore an MPD shirt with a badge underneath his vest.  (*See id.* at 14:2–4, 45:7–14.)[2]

While driving northbound on the 4600 block of Livingston Road, Southeast, the officers observed Miller and another individual walking southbound on the sidewalk while apparently engaged in a conversation.  (*See id.* at 14:19–21, 15:16–19, 22:14–16, 56:8–12.)  Consistent with his standard practice, Officer Wright slowed the car, pulled

---

[2] Officer Hiller initially testified that all three officers wore casual attire underneath their tactical vests (*see* Hr'g Tr. at 14:2–4), but he later clarified that Detective Delpo was, in fact, wearing an MPD shirt with a badge underneath his tactical vest (*see id.* at 45:12–14).

up alongside the two individuals, identified himself as police, and asked the two men if they were carrying any firearms. (*See id.* at 16:24–17:10, 113:9–10, 119:1–5.) Officer Hiller testified that, in response to Officer Wright's question, Miller replied, "no," and then turned his body away from the police vehicle and lifted the back of his vest jacket to reveal his rear waistband. (*Id.* at 17:12–14 (testimony of Officer Hiller); *see also id.* at 18:14–21.) The second individual lowered his head and continued walking along the sidewalk at a faster pace. (*See id.* at 17:14–16.)

While still seated in the vehicle, Officer Wright then called out to the second individual to ask if he was carrying any firearms. (*See id.* at 18:24–19:1.) According to Officer Hiller's testimony, in response to this question directed at the second individual, Miller "turned around almost frantically . . . and showed the back of his waistband again," while repeatedly stating "no." (*Id.* at 19:2–4 (testimony of Officer Hiller).) After Miller revealed his rear waistband in this manner, he then continued to walk in the direction of the second individual. (*See id.* at 23:14–15.)

Officer Hiller testified that, based on Miller's frantic demeanor and "strange" mannerisms, as well as the second individual's avoidant behavior, he and Detective Delpo decided to exit the vehicle to speak further with the two men. (*Id.* at 24:2–7 (testimony of Officer Hiller); *see also id.* at 68:4–7.) Officer Hiller approached Miller, while Detective Delpo approached the second individual, who was standing approximately 20 feet away from Miller at this point. (*See id.* at 25:2–8.) Officer Wright remained in the unmarked vehicle. (*See id.* at 25:9–14.)

Upon exiting the vehicle, Officer Hiller walked toward Miller and asked, "Hey man can I talk to you?" (Gov't Opp'n at 2; *see also* Hr'g Tr. at 61:8–11 ("Q: Okay.

4

And you said at that point you called out to Mr. Miller saying, Hey, can I talk to you or something like that; is that right? A. Correct.") (testimony of Officer Hiller).)  Officer Hiller's firearm was visible in his right hip holster but was not drawn.  (*See* Hr'g Tr. at 24:8–10, 61:12–22.)  In response to Officer Hiller's question, Miller stopped walking, turned around to face Officer Hiller, and began walking toward Officer Hiller with a nervous look on his face.  (*See id.* at 24:18–19, 25:23–24.)  Officer Hiller then calmly asked, "Hey, man, do you have any firearms on you?"  (*Id.* at 27:13–14 (testimony of Officer Hiller); *see also id.* at 24:11–12.)

In response to this second question from Officer Hiller, Miller turned away from Officer Hiller to face the wrought-iron fence that was beside the sidewalk, and again lifted the back of his jacket to reveal his rear waistband.  (*See id.* at 27:15–18.)  Officer Hiller testified that he did not instruct Miller to turn toward the fence in this manner. (*See id.* at 28:19–23.)  Officer Hiller then asked, "What about the front of your waistband?"  (*Id.* at 30:23–24 (testimony of Officer Hiller).)  In response, Miller grasped the wrought iron fence with both hands, and mumbled something that, according to Officer Hiller, could not be understood.  (*See id.* at 30:24–25, 32:1–2.) Officer Hiller explained that he could not hear Miller, who was still facing away from Officer Hiller at this point.  (*See id.* at 32:20–21.)  Miller again replied by mumbling something that Officer Hiller could not understand.  (*See id.* at 32:23–24.)  Officer Hiller then asked Miller to turn around, stating, "We're both men, we can talk face-to-face."  (*Id.* at 33:14–16 (testimony of Officer Hiller).)  In response, Miller turned around to face Officer Hiller with a "nervous" and "frantic" look on his face.  (*Id.* at 34:23–24 (testimony of Officer Hiller).)  While the two men stood face-to-face, Officer

Hiller again asked whether Miller had a gun.  (*See id.* at 34:24−35:1.)  At this point, Miller exclaimed, "I have one[!]  I've been telling you I have one.  Just take it, you can have it, you can have it, just take it."  (*Id.* at 35:2−4 (testimony of Officer Hiller).)

Upon hearing Miller's admission that he had a gun in his possession, Officer Hiller immediately placed Miller into a "bear hug," which is a maneuver whereby the officer places his arms under the suspect's shoulders and around his body in order to raise his arms upwards and thereby prevent the suspect from accessing the firearm.  (*Id.* at 36:10−13, 37:24−25.)  Officer Hiller then called out a code word to the other officers, indicating the presence of a firearm, and Detective Delpo ran over to assist Officer Hiller in placing Miller in handcuffs and under arrest.  (*See id.* at 37:5−7.)

At this point, Officer Wright—who had been turning the car around in order to secure the perimeter during the period in which Officer Hiller and Detective Delpo were talking to Miller and his acquaintance—exited the car to assist Officer Hiller and Detective Delpo.  (*See id.* at 120:20−23, 114:15−18.)  Once Miller was placed under arrest, the three officers called for a crime scene search officer to remove and process the firearm that Miller had referenced.  (*See id.* at 53:8−25.)  The crime scene search officer arrived approximately five minutes later, and removed a .40 caliber Smith & Wesson semi-automatic handgun from Miller's front waistband.  (*See id.* at 50:12−21, 53:16−25.)  The handgun magazine was loaded with nine rounds of ammunition.  (*See id.* at 50:22−25, 51:9−10.)

### B.    Arrest-Related Facts That Miller Asserted During The Hearing

Miller also testified at the evidentiary hearing, and he provided an account of the March 31st encounter that differs from that of the officers in five notable respects.

First, Miller testified that, in addition to asking whether he had a firearm, the MPD officer specifically asked Miller and his companion an additional question from inside the vehicle: "Can we see your waistbands?" (*Id.* at 75:19–76:5.)  Miller testified that he lifted his jacket to reveal his rear waistband in response to this question.  (*See id.* at 76:5–6, 100:24–101:3.)

Second, and more fundamentally, Miller testified that *Officer Hiller* was *not* the officer who approached him on the sidewalk, and in fact, Miller asserted that the entire conversation that Officer Hiller recounted in detail while on the stand—testimony that Miller heard—actually never occurred.  (*See id.* at 83:21–25, 107:22–108:11.)  Miller maintained that it was the two *other* officers (Officer Wright and Detective Delpo) who exited the car and spoke with Miller on the sidewalk prior to his arrest.  (*See id.* at 77:4–10, 78:1–4, 107:8–9.)  In other words, despite the account that Officers Hiller and Wright consistently testified to, Miller claimed that not one, but two, MPD officers approached him on the sidewalk, and that neither officer was Officer Hiller.  (*See id.* at 107:1–108:11.)  Miller explained that he specifically recalled that Officer Wright approached him because Officer Wright had a distinctive beard.  (*See id.* at 78:2–4, 80:1–9, 81: 5–21.)

The third key difference between Miller's testimony and the officers' testimony was the manner in which Miller characterized the initial statement that one of the officers made to him upon exiting the vehicle.  Miller testified that when the two officers exited the unmarked vehicle and approached him, one officer said, "You two, hold up for a second[,]" or "You two stop for a second, hold up for a second[,]" rather than "Hey man can I talk to you?"  (*Id.* at 102:24–103:1, 106:8–9.)  Miller did not

7

specify which officer allegedly made this statement.  (*See id.* at 102:24–25.)  Miller

also testified that Officer Wright and Detective Delpo *ordered* him to turn toward the

fence and to place his hands on the fence (*see id.* at 78:6–13, 79:12–13), and that he

took both actions in compliance with the officers' express orders (*see id.* at 78:6–8,

79:12–13).

Finally, Miller claimed that, when his hands were up against the fence, Officer

Wright stated, "Before I search you, do you want to come clean about having something

on you?"  (*Id.* at 79:17–20, 82:13–18.)  Miller testified that he admitted that he was

carrying a firearm because he "figured that they [were] already going to search [him]

anyway and they had [him] surrounded against the fence."  (*Id.* at 82:13–18.)

## II.    FINDINGS OF FACT

As outlined above, at the Court's evidentiary hearing, the witnesses for the

prosecution and the defense provided directly conflicting accounts of the events of

March 31, 2016.  This Court has considered the testimony and demeanor of all of the

witnesses, and it accepts the testimony of Officers Hiller and Wright because it finds

that their account of the events pertaining to Miller's arrest is most credible.

Several factors undercut Miller's story.  As noted previously, Miller testified that

the conversation Officer Hiller recounted *never occurred* and that, in fact, Miller only

spoke with Officer Wright and Detective Delpo.  (*See id.* at 83:19–25.)  But Officer

Hiller provided a detailed account of how he contacted Miller on the sidewalk, and in so

doing, he exhibited a high degree of recall regarding this conversation.  (*See, e.g.*, *id.* at

33:15–16 ("I actually said something to th[e] effect [of,] 'We're both men, we can talk

face-to-face.'").)  Moreover, this Court believes Officer Hiller's credible testimony

regarding the events leading up to the dramatic culmination of this sidewalk encounter—whereby Officer Hiller wrapped Miller in a "chest-to-chest" bear hug following Miller's admission that he was carrying a firearm (*id.* at 37:19−23)—and, thus, it is difficult for the Court to credit Miller's assertion that Officer Hiller was entirely uninvolved in Miller's arrest.

What is more, Officer Hiller's account of what happened was corroborated by Officer Wright, who was not present in the courtroom when Officer Hiller or Miller testified.  Officer Wright explained that, after the initial inquiry, he remained in the vehicle and observed Officer Hiller talking to Miller.  (*See id.* at 114:1−8.)  Officer Wright also explained that the Ford Explorer was his assigned vehicle and that he drives it the "overwhelming majority of the time" when he is partnered with Officer Hiller, lending further support to Officers Hiller and Wright's testimony that Officer Wright remained in the vehicle during the encounter.  (*Id.* at 117:16−18 (testimony of Officer Wright); *see also id.* 117:8−11.)  Officer Wright's *Gerstein* affidavit further corroborates the account that Officers Hiller and Wright provided during the hearing; it details the encounter in a manner that is substantially similar to the officers' live testimony.  (*See Gerstein* Aff. of John Wright, Ex. 13 to Gov't Opp'n, at 1.)[3]  Finally, this Court can conceive of no reason *why* Officers Hiller and Wright would fabricate their account in the way that Miller suggests; as far as this Court can tell, it makes no difference whether the contact was made by Officer Hiller alone, or Officer Wright and Detective Delpo together, and thus, the officers simply had no motivation to

---

[3] A *Gerstein* affidavit is an arresting officer's sworn statement that is prepared at or near the time of an arrest and that states that probable cause exists to believe that a crime was committed and that the person identified in the statement is the one who committed it.  *See Gerstein v. Pugh*, 420 U.S. 103, 120, 124 n.25 (1975).

misrepresent the identity of the officer who approached and arrested Miller. *Cf.*
*Jackson v. United States*, 353 F.2d 862, 866 (D.C. Cir. 1965) (explaining that the court
properly considers "whether the witness was interested in the outcome" when assessing
credibility); *Wierzbicki v. United States*, 32 F. Supp. 3d 1013, 1024 (D.S.D. 2014) ("In
evaluating the credibility of a witness, a court considers . . . any motives that witness
may have for testifying a certain way." (internal quotation marks and citation omitted)).

In short, based on the credible and detailed testimony that the officers presented,
the consistencies between Officers Hiller and Wright's testimony and the *Gerstein*
affidavit, and also the absence of any motive for Officers Hiller and Wright to fabricate
their accounts, this Court credits Officers Hiller and Wright's testimony regarding the
circumstances leading up to Miller's arrest, and does not accept Miller's conflicting
account of those same events.

## III.   ANALYSIS

Having found (for the purpose of evaluating Miller's motion to suppress) that the
facts are as Officers Wright and Hiller described them during the hearing, this Court
now turns to evaluate Miller's contention that he was unlawfully seized in violation of
the Fourth Amendment, and thus, that the gun and ammunition that he was carrying on
his person when the officers arrested him should be suppressed. As explained below,
Miller was not seized for Fourth Amendment purposes until he was physically
restrained, and at the time of this seizure, Officer Hiller had probable cause to believe
that Miller was committing a crime. Consequently, there was no Fourth Amendment
violation.

A.      **Legal Standard**

The Fourth Amendment guarantees the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.  As a result of this guarantee, "all seizures" must "be founded upon reasonable, objective justification." *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 247 (2015).  It is clear beyond cavil, however, that "not all interactions between police officers and citizens amount to a 'seizure' for Fourth Amendment purposes." *Id.*  Consensual encounters plainly fall outside the scope of the Fourth Amendment.  *See Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Florida v. Rodriguez*, 469 U.S. 1, 5–6 (1984).  A Fourth Amendment seizure occurs only "when physical force is used to restrain movement or when a person submits to an officer's 'show of authority.'" *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).  The threshold task of the Court, then, is to determine when, if at all, a Fourth Amendment seizure occurred.

No seizure will have taken place unless a "reasonable person in view of all the circumstances surrounding the incident, . . . would have believed that he was not free to leave." *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016) (quotation marks omitted) (quoting *United States v. Wood*, 981 F.2d 536, 539 (D.C. Cir. 1992)); *see also Gross*, 784 F.3d at 787 ("That 'reasonable person' test asks, 'not . . . what the defendant himself . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.'" (quoting *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (per curiam))).  Courts have concluded that "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to

leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.); *see also Goddard*, 491 F.3d at 460 ("[W]e [also] consider the demeanor of the approaching officer, whether the officer . . . wore a uniform, and the time and place of the encounter." (internal quotation marks and citations omitted)).

Significantly for present purposes, it is by now well established that "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002); *see also id.* at 201 ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage." (citing *Bostick*, 501 U.S. at 434)); *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion); *United States v. Lewis*, 921 F.2d 1294, 1297–98 (D.C. Cir. 1990). Such questioning rises to the level of a Fourth Amendment seizure only when the officers "'convey a message that compliance with their requests is required[,]'" *Gross*, 784 F.3d at 787 (quoting *Bostick*, 501 U.S. at 435), or otherwise "induce cooperation by coercive means[,]" *Drayton*, 536 U.S. at 201. *See also Castle*, 825 F.3d at 633. The Supreme Court has also made clear that, "[w]hile most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Drayton*, 536 U.S. at 205 (internal quotation marks

and citation omitted).

Once an encounter loses its consensual nature, it becomes a seizure for Fourth Amendment purposes, and must "be founded upon reasonable, objective justification." *Gross*, 784 F.3d at 786 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).  The justification that is required depends upon the character of the police-citizen interaction at issue.  Generally, Fourth Amendment seizures must be supported by probable cause.  *See Dunaway v. New York*, 442 U.S. 200, 208–09 (1979); *see also id.* at 208, n.9 ("Probable cause exists where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed [by the person to be arrested]." (alterations in original) (internal quotation marks and citations omitted)).  However, in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court recognized a narrow exception to the probable cause requirement, permitting officers to justify a "brief, investigatory stop" by providing "a reasonable, articulable suspicion that criminal activity is afoot."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Thus, once a court has concluded that a seizure has occurred, in order to decide whether or not that seizure violated the Fourth Amendment, the court must identify the "rubric of police conduct" at issue, and then determine whether the officers have provided the requisite justification for that conduct. *Dunaway*, 442 U.S. at 209.

Finally, as a general matter and subject to certain exceptions not implicated here, "[w]hen the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure."  *United States v.*

*Sheffield*, 799 F. Supp. 2d 22, 28 (D.D.C. 2011) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).  "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).  However, "[w]hen a defendant establishes that he was arrested or subjected to a search without a warrant, the burden then shifts to the government to justify the warrantless search." *United States v. Williams*, 878 F. Supp. 2d 190, 197 (D.D.C. 2012); *see also United States v. Jones*, 374 F. Supp. 2d 143, 147 (D.D.C. 2005) ("The government bears the burden of justifying this warrantless seizure."); 6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.2(b) (5th ed. 2012) ("[I]f the search or seizure was pursuant to a warrant, the defendant has the burden of proof; but if the police acted without a warrant[,] the burden of proof is on the prosecution.").

> **B.    Discussion**

Miller raises two alternative arguments in support of his motion to suppress: (1) that the officers subjected him to a show of authority (i.e., they seized him) when they initiated contact with him from inside their vehicle, or, alternatively, (2) that Officer Hiller subjected Miller to a show of authority when Officer Hiller exited the vehicle and made further contact with Miller.  (*See* Hr'g Tr. at 9:24–25, 138:11–16; Def.'s Mot. at 4–5.)  For the reasons explained below, no seizure occurred at either of those points in time and, indeed, a cognizable Fourth Amendment seizure occurred only when Officer Hiller physically restrained Miller following Miller's admission that he had a gun, at which point there was ample probable cause to justify that seizure and Miller's subsequent arrest.

1.  <u>Miller Was Not Seized When The Officers Called Out To Him From Inside Their Unmarked Vehicle To Ask If He Was Carrying A Gun</u>

In order to determine whether the police subjected Miller to a show of authority that qualifies as a seizure for the purpose of the Fourth Amendment, the Court must determine if, "'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Wood*, 981 F.2d at 539 (quoting *Mendenhall*, 446 U.S. at 554).  Miller contends that a reasonable person in his situation would not have felt free to leave once the officers called out to him from their unmarked vehicle, because there were multiple armed officers wearing tactical vests marked "police," and the officers repeatedly asked whether Miller had a gun.  (*See* Def.'s Mot. at 4–5; Hr'g Tr. at 139:6–15.)  But given the current state of the law in this Circuit, Miller is mistaken to maintain that these circumstances constitute a Fourth Amendment seizure.

A recent D.C. Circuit case, *United States v. Gross*, 784 F.3d 784 (D.C. Cir. 2015), is particularly informative.  In *Gross*, the Circuit evaluated a Fourth Amendment suppression motion in a case involving four Gun Recovery Unit officers wearing tactical vests who drove up beside the defendant as he was walking along the sidewalk. *See id.* at 785.  One officer spoke to the defendant "from [inside] the police car," and "asked if [the defendant] was carrying a gun and would expose his waistband." *Id.* at 787.  The D.C. Circuit considered—and specifically rejected—all of the arguments that Miller now raises in support of his first seizure argument, and concluded that no seizure occurred.  Specifically, the *Gross* panel made clear that, while certainly probative of the issue of whether the individual was subjected to a show of authority, "'the presence of multiple officers' wearing '[police] gear, including guns and handcuffs,' does not

'automatically mean that a stop has occurred.'" *Id.* at 787 (alteration in original)
(quoting *Goddard*, 491 F.3d at 461). And the D.C. Circuit emphasized that, "[a]lthough
the presence of a police car might be somewhat intimidating, the act of approaching a
person in a police car does not constitute a seizure where the officers [do] not use their
siren or flashers, [do] not command the [person] to stop, [do] not display their weapons,
and [do] not drive aggressively to block or control the [person's] movement." *Id.* at
788 (first alteration added) (internal quotation marks and citations omitted); *see also id*.
at 787 (explaining that the circumstances were "less suggestive of a seizure" because
"all four officers remained in a car separated from [the defendant] by one lane of traffic
during [the officer's] questioning").

In the instant case, according to the testimony of Officers Hiller and Wright, all
three officers remained in their unmarked Ford Explorer while Officer Wright called out
to Miller from the rolled-down car window to ask if Miller had a gun. (*See* Hr'g Tr. at
16:24–17:6, 113:9–12.) As in *Gross*, "while the officers carried weapons, there is no
indication that the weapons were visible to [the defendant] from the sidewalk." *Gross*,
784 F.3d at 787. In fact, Officer Hiller specifically testified that none of the officers
had their weapons out while inside the car, and that his firearm was located on his right
hip. (*See* Hr'g Tr. at 23:3–6, 61:12–21). Moreover, Miller never indicated that he was
able to see the officers' firearms while they addressed him from inside their vehicle.
There is likewise no evidence to suggest that Officer Wright positioned the vehicle so
as to block or otherwise limit Miller's freedom of movement on the sidewalk. Thus,
this Court concludes that the three MPD officers in tactical vests did not subject Miller

to a show of authority merely by pulling their unmarked car alongside Miller while he was walking down the sidewalk.

The officers' questioning of Miller from inside the vehicle similarly did not convert the encounter into a seizure.  Although "the nature of a police officer's question[s] can bear on whether a person has been seized[,] [q]uestions alone . . . ordinarily do not amount to a 'show of authority' sufficient to constitute a seizure." *Gross*, 784 F.3d at 788 (first alteration in original) (citation omitted); *see also id.* (acknowledging that "direct *accusations* of criminal conduct by officers have weighed in favor of finding a seizure" (emphasis in original) (citation omitted)).  As noted previously, Officers Hiller and Wright both testified that Officer Wright called out to Miller from inside the car and asked if Miller was carrying a gun.  (*See* Hr'g Tr. at 16:24–17:10, 67:10–13, 113:9–14.)  The *Gross* Court analyzed substantially similar officer questioning, *see* 784 F.3d at 788 ("Do you have a gun?", "Can I see your waistband?"), and concluded that the Gun Recovery Unit officers "did not accuse [the defendant] of possessing a gun or committing a crime[,]" and that the officer's questions "did not effect a seizure for purposes of the Fourth Amendment[,]" *id.* at 788.

This Court finds that the factual circumstances Miller emphasizes are materially indistinguishable from those in *Gross*, and that *Gross* compels the conclusion that no seizure occurred when the officers initiated contact with Miller from inside their vehicle.

  2. <u>Miller Was Not Seized When Officer Hiller Exited The Vehicle And Asked To Speak With Miller</u>

Miller alternatively contends that the encounter progressed into a seizure when Officer Hiller, who was armed with a gun in his hip holster, exited the vehicle and

approached Miller, and when he again asked Miller whether he was carrying a gun.

(*See* Hr'g Tr. 138:11–16, 141:12–142:19; Def.'s Mot. at 4–5.)[4]  The issue of whether a

seizure occurred at that point in the encounter presents a closer question, but this Court

concludes that no Fourth Amendment seizure occurred when Officer Hiller exited the

vehicle and asked to speak further with Miller for the following reasons.

First, Officer Hiller's approach did not constitute a show of authority in and of

itself, because "[t]he approach and direction of a question by a police officer cannot be,

as a matter of fact or of law, a seizure of the person so approached."  *Gomez v. Turner*,

672 F.2d 134, 142 (D.C. Cir. 1982).  Rather, "[t]here must be some additional conduct

by the officer to overcome the presumption that a reasonable person is willing to

cooperate with a law enforcement officer."  *Id.*  Officer Hiller credibly testified that he

exited the vehicle, approached Miller on the sidewalk, and asked something to the

effect of, "Hey man can I talk to you?"  (Gov't Opp'n at 2; *see also* Hr'g Tr. at 61:8–11

(testimony of Officer Hiller).)  Officer Hiller further testified that he made this request

in a calm, conversational tone.  (*See* Hr'g Tr. at 24:11–12, 24:20–21.)  In responding to

Officer Hiller's question, Miller halted his journey in the opposite direction, turned

around, and walked toward Officer Hiller (*see id.* at 24:18–19), which also indicates

willing cooperation on Miller's part.  Thus, Officer Hiller did not seize Miller for

Fourth Amendment purposes merely by exiting the vehicle and approaching him with a

question.

---

[4] As explained above, during the hearing, Miller testified that it was Officer Wright and Detective Delpo—not Officer Hiller—who approached him in this manner.  (*See* Hr'g Tr. at 77:4–10, 78:1–4, 107:8–9.)  However, this Court has already decided to credit the officers' testimony regarding the identity of the officer who exited the vehicle and spoke directly to Miller, and, in any event, this discrepancy has no bearing on the Court's legal analysis.

Nor did Officer Hiller seize Miller when Officer Hiller posed further questions while they were both standing on the sidewalk.  The Supreme Court has "held repeatedly that mere police questioning does not constitute a seizure."  *Bostick*, 501 U.S. at 434; *see also id.* at 434−35 ("[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual.").  As explained, it is well established that police officers may freely pose questions, so long as they do not "convey a message that compliance with their requests is required."  *Id.* at 435.  This means that the officer's tone and statements might convey a message that rises to the level of a seizure.  *See, e.g.*, *Castle*, 825 F.3d at 633 (finding seizure where an officer instructed the defendant to remove his hands from his pockets and to "hold on," while blocking the defendant's path); *Wood*, 981 F.2d at 540 (finding seizure where a uniformed officer, blocking the defendant's path, ordered the defendant to "halt right there" and "stop"); *United States v. Jones*, 142 F. Supp. 3d 49, 54, 59 (D.D.C. 2015) (finding seizure where Gun Recovery Unit officers exited their vehicle and attempted to keep the defendant from departing by stating, "I need to talk to you for a second, you need to stop").  However, here, no seizure occurred at the point in which Officer Hiller posed additional questions to Miller, because Officer Hiller did not suggest that Miller was required to answer.

Rather, Officer Hiller credibly testified that his investigatory questions were limited to inquiries such as: "Hey man can I talk to you?"; "Hey, man, do you have any firearms on you?"; "What about the front of your waistband?"; and other, similar requests related to the potential presence of firearms.  (Hr'g Tr. at 27:13−14, 30:23−24, 61:8−11; Gov't Opp'n at 2.)  Furthermore, when Miller turned away and Officer Hiller

was unable to understand Miller's responses, Officer Hiller asked Miller to turn back towards him in a respectful manner, stating, "We're both men, we can talk face-to-face." (Hr'g Tr. at 33:16 (testimony of Officer Hiller); *see also id.* at 33:14−16.) Officer Hiller testified that his tone of voice remained calm throughout the encounter, and unlike the officers in the *Castle* or *Wood* cases, Officer Hiller never made any threatening commands, and credibly characterized the entire encounter as a mere conversation. (*See id.* at 33:20−22, 34:6); *cf. Castle*, 825 F.3d at 633; *Wood*, 981 F.2d at 540. This Court is persuaded that the circumstances described were such that a reasonable person in Miller's position would have believed he was free to leave up until the point when Miller admitted he had a firearm (*see* Hr'g Tr. at 35:21−25, 51:17−22), and, therefore, in this Court's view, no seizure occurred at that point in the encounter, *see Lewis*, 921 F.2d at 1297.[5]

Notably, the fact that Officer Hiller was armed throughout his conversation with Miller does not, without more, alter this Court's conclusion. *See Goddard*, 491 F.3d at 461 ("[T]he fact that . . . officers [wear police] gear, including guns and handcuffs, does not mean that a stop occurred."); *see also id.* at 461−62 (concluding no seizure occurred when four officers "jump[ed]" out of their police car and approached the defendants while wearing police gear and carrying guns); *United States v. Lloyd*, 868 F.2d 447, 451 (D.C. Cir. 1989) (concluding no seizure occurred when one officer

---

[5] Although Miller's account of the interaction—which featured one officer purportedly ordering Miller to "hold up for a second[,]" followed by Officer Wright and Detective Delpo "surround[ing]" Miller near the fence (Hr'g Tr. at 82:14, 106:9)—bears similarities to the circumstances that supported a seizure in the *Castle*, *Wood*, and *Jones* cases, this Court has declined to credit Miller's testimony, and thus, it need not determine whether a Fourth Amendment seizure occurred under Miller's version of events. *Cf. Castle*, 825 F.3d at 633; *Wood*, 981 F.2d at 540; *Jones*, 142 F. Supp. 3d at 54, 59.

"dressed in plain clothes" "politely asked [the defendant] a series of questions," and

"neither made threats nor brandished weapons"). Officer Hiller credibly testified that

he calmly approached Miller, and that his firearm was not brandished at any point

during the encounter, despite the fact that it was visible in his hip holster. (*See* Hr'g Tr.

at 23:3–6, 24:8–12, 61:12–18.) In short, there is no indication that Officer Hiller took

any actions—with his firearm or otherwise—that were designed to threaten or

intimidate Miller. Consequently, the Court confidently concludes that no seizure

occurred when Officer Hiller exited his vehicle and asked to speak further with Miller.[6]

> 3. <u>Miller Was Seized When Officer Hiller Physically Restrained Him To Effectuate His Arrest; However, At That Point, Officer Hiller Had Probable Cause For The Seizure Based On Miller's Admission That He Was Carrying A Gun</u>

It is axiomatic that a "'Fourth Amendment seizure [occurs] . . . when there is a

governmental termination of freedom of movement through means intentionally

applied.'" *Scott v. Harris*, 550 U.S. 372, 381 (2007) (alterations in original) (quoting

---

[6] The Court's conclusion that there was no seizure at this point in Miller's encounter with the police not only disposes of Miller's argument that physical evidence (the gun itself) should be suppressed, but also addresses the argument Miller's counsel made during the hearing regarding suppression of the pre-arrest statements that Miller made in response to the officers' repeated inquiries regarding the presence of guns. (*See* Hr'g Tr. at 9:14–16.) Defense counsel argued that, just as Miller was "seized" by the officers' repeated inquiries about guns, so too was Miller in "custody" for *Miranda* purposes when the officers questioned Miller in this manner. (*See id.* at 9:2–10:4.) Courts employ discrete analyses when assessing whether a defendant was "seized" within the meaning of the Fourth Amendment, or was "in custody" for the purposes of *Miranda*; however, these analyses are fundamentally similar. *See, e.g.*, *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) ("The ultimate 'in custody' determination for *Miranda* purposes" requires courts to employ an objective standard that focuses on whether "a reasonable person" in the suspect's position would "have felt he or she was not at liberty to terminate the interrogation and leave"); *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam); *United States v. Richardson*, 36 F. Supp. 3d 120, 126–27 (D.D.C. 2014) ("[W]hen determining whether a suspect is in 'custody' within the meaning of *Miranda*, courts have considered circumstances including the location and length of the encounter, the number of officers and citizens present, whether the police entered the location by force, whether the officers' weapons were visible or drawn, whether officers were present throughout the encounter, whether the suspect was handcuffed, and the tone and demeanor of the officers and the suspect." (citations omitted)). Thus, because this Court concludes that Miller was not "seized" when he responded to the officers' questions for the reasons explained above, this Court likewise concludes Miller was not "in custody" for *Miranda* purposes, and accordingly denies Miller's motion to suppress his pre-arrest statements.

*Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989)); *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Terry*, 392 U.S. at 16 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

Officer Hiller's actions following Miller's admission that he was carrying a gun easily fit this well-established seizure definition.  Officer Hiller credibly testified that, upon hearing Miller's admission that he was carrying a gun, Officer Hiller immediately placed Miller in a chest-to-chest bear hug—a maneuver whereby Officer Hiller placed his arms under Miller's shoulders and around Miller's body in order to raise Miller's arms upward and to prevent Miller from accessing any firearm.  (*See* Hr'g Tr. at 36:10–13, 37:24–25.)  Officer Hiller acknowledged that he physically restrained Miller in this manner in order to "make sure that we [could] place [Miller] under arrest without anybody getting hurt."  (*Id.* at 37:1–3 (testimony of Officer Hiller).)  There can be little doubt that Officer Hiller's act—which was plainly designed to restrain Miller's freedom of movement while Officer Hiller effectuated the arrest—constituted a Fourth Amendment seizure.  *See Terry*, 392 U.S. at 16.

Furthermore, with respect to the issue of whether the government has established the necessary justification for that warrantless seizure for Fourth Amendment purposes, this Court finds that, at the moment Officer Hiller physically restrained Miller, Officer Hiller had the requisite probable cause to justify the arrest.  *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.").  It is well established that "[p]robable cause exists

where 'the facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Draper v. United States*, 358 U.S. 307, 313 (1959) (fourth alteration in original) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).  And when Officer Hiller wrapped Miller in a bear hug, Officer Hiller had knowledge of the following facts: (i) Miller appeared nervous and frantic throughout the encounter; (ii) Miller had repeatedly shifted his body away from the officers in an effort to conceal the front portion of his waistband; (iii) similar efforts by individuals to conceal their waistband while communicating with the police had been a means of concealing the presence of a firearm[7]; and (iv) Miller expressly admitted that he was carrying a firearm.  (*See* Hr'g Tr. at 18:14–21, 19:2–4, 24:2–7, 34:23–35:4, 68:4–13, 71:2–16.) The Court concludes that, under the circumstances presented here, these facts were sufficient to justify Officer Hiller's belief that Miller was committing a criminal offense when Officer Hiller seized him, and as a result, Miller's seizure was not an unlawful violation of the Fourth Amendment.

## IV.   CONCLUSION

Up until the moment that Officer Hiller physically restrained Miller, the encounter between Miller and the MPD officers (as the government has credibly described it) was a consensual interaction that does not warrant Fourth Amendment scrutiny.  No Fourth Amendment seizure occurred until Officer Hiller wrapped Miller in a bear hug and, at that point in time, Officer Hiller had probable cause to justify

---

[7] Officer Hiller testified that he knew this from his own experience.  (*See* Hr'g Tr. at 68:4–13, 71:2–16.)

Miller's arrest, as explained above.  Accordingly, and as set forth in the order accompanying this opinion, Miller's motion to suppress physical evidence is **DENIED**.


DATE:  November 11, 2016              *Ketanji Brown Jackson*
                                     KETANJI BROWN JACKSON
                                     United States District Judge